All arguments not to exceed 15 minutes per side. Mr. Adams for the moment. Good morning and may it please the court. I'd like to reserve three minutes for rebuttal if I may. Notwithstanding the somewhat complicated procedural history of the case and complicated technology at issue, the question before this court is relatively simple and relatively clean. And that is, who owns the technology known as Tamper Reactive Secure Storage? For purposes of argument today, I'll refer to it as TRSS. And that question itself turns on just two agreements and one confirmed bankruptcy reorganization, which was never appealed. The first agreement at issue is Pro Marketing's security interest, which was in relation to a loan that Pro Marketing made to Priva in 2009. The second agreement occurred almost three years to the day after that initial agreement, and it occurred in the middle of a very difficult bankruptcy proceeding. And that was Cyber Security's design and license agreement. That agreement became the centerpiece of the bankruptcy's reorganization, confirmed reorganization. Now, the design and license agreement was not some secretive document designed to take away rights from Pro Marketing and its security interest. In fact, it was the exact opposite. It was conceived and executed in the brightest possible light of day. Parties were allowed to object to it, and a bankruptcy judge had to make the ultimate determination of appropriateness. And nobody ever objected to the design portion of the design and license agreement. And the design portion of the design and license agreement makes it abundantly clear that when Cyber Solutions paid for improvements to the underlying technology, which I'll refer to as SKIZZIK, it's the best thing I can come up with, when Cyber Solutions paid for the upgrades to that SKIZZIK technology, Cyber Solutions would own that technology. The problem you've got, however, is that Pro Marketing was not a party to the subsequent agreement between PRIVA and Cyber Solutions, so that if the security agreement between PRIVA had priority over the subsequent agreement between PRIVA and Cyber Solutions, you'd basically be out of luck, because the security agreement between Pro Marketing and PRIVA is very broadly worded, as you would expect. All property and security and assets and after acquired property and so on and so forth. So isn't that the problem that you face here? It's not, Your Honor, and there's two reasons why. There's two separate answers to that. The first is the critical definition, just forget the confirmed bankruptcy reorganization, just the documents themselves. The security interest that Pro Marketing has, as defined in the security agreement, attaches to collateral that PRIVA owns. That makes sense. Their lien can only attach to what PRIVA owns. Now, of course, PRIVA owns part of the collateral's intellectual property, part of that is the SKIZZIK IP, there's no question about that. Well, it doesn't just talk about physical property, it refers to all material contracts and agreements and property and property interests. I mean, the investment property, securities, receivables, intellectual property, the wording is sufficiently broad that it would arguably encompass the licensing agreement between Cyber Solutions and PRIVA, especially since this chip that was worked on, wasn't that already owned by PRIVA at the time of the security agreement between PRIVA and Pro Marketing? It was further developed pursuant to this agreement between PRIVA and Cyber Solutions? I don't know exactly when it was developed, but, Your Honor, there's no dispute in this case that Pro Marketing has the rights to the SKIZZIK IP. That's not the dispute. The dispute is, once the design and license agreement comes into place, and this, I think, will answer the second part of your question. The design and license agreement makes it clear, PRIVA never owns the developments made to the improvements made to the SKIZZIK IP, because under the design and license agreement, it is Cyber Solutions that owns those. Yeah, but that was pursuant to the agreement between PRIVA and Cyber Solutions. The problem you would have would be if that agreement is subordinate to the prior agreement between PRIVA and Pro Marketing. That's really the problem. That defines collateral as including intellectual property, which includes copyrights and copyright licenses. I'm sort of following up on Judge Clay's question. Why aren't you subordinate to that? The first answer is that the agreements are clearly crafted to create a difference between the two, but the answer to that, Your Honor, is this was a part of the confirmed bankruptcy reorganization plan, and for Cyber Solutions to come in and invest hundreds of thousands of dollars, not just on the license portion. There was hundreds of thousands of dollars to just get the license to use the SKIZZIK, but to then turn around and invest hundreds of thousands of dollars to make these improvements. It is undeniably clear, and the bankruptcy judge was clearly aware of this, there's two pieces to this. One is the license agreement to try to save this company and keep it alive, but the other is that Cyber Solutions has the incentive to come in and make improvements to that technology, which it did. It paid for with its own money, and clearly under the design and license agreement, they own it. That's the exact language in section, I think it's 5.2. How do you get over that? I'm reading from Judge Hughes. He's the bankruptcy judge, right? Yes, sir. Reiterated his rationale for approving the plan and his opinion on the preliminary injunction. Part of it says, the court went forward with the confirmation only after first receiving assurances from PREVA that PMSs, and that's pro-marketing, right? Yes, sir. Interest is not being so impaired. That is, that Cyber Solutions was gaining its license rights to the SKIZZIK technology subject to PMSs only and of rights in the same. Therefore, Cyber Solutions was assuming the risk that these rights might be disrupted were PREVA later to default under the separate arrangement it had had with PMS concerning its claim and attendant lien rights under the confirmed plan. So your client knew that it was taking this, it was in effect assuming the risk. But I think, Your Honor, here's the important part about that opinion. The judge is talking about the SKIZZIK technology, which we agree, and the design and license agreement is up front about that. The second amendment, or excuse me, the second recital in the design and license agreement, states very clearly that pro-marketing's liens on the underlying SKIZZIK technology remain. But what the bankruptcy judge isn't talking about there is the TRSS and the payments that, that, that... The TRSS is an outgrowth of the SKIZZIK technology, right? That's absolutely right, Your Honor. But just like any derivative product, it's independently ownable and it's independently copyrightable. You're saying that PRIM, PRIMA, PREVA never had any ownership interest at all in the TRSS? That's exactly right, Your Honor. Under the design and license... It developed it. So how could it never, at least for an instant or two before it was supposedly transferred to Cyber Solutions under the license agreement, not have had some ownership interest? On the design portion, it was very clear that it was Cyber Solutions that would make these developments and that it would use PREVA. This is another way to get them through this process. They made PREVA the exclusive, essentially, contractor, if you will, to support them in that. But no, Your Honor, under the clear terms of the design and license agreement, that is, that is Cyber Solutions property. The improvements to TRSS... But that's where Judge Clay keeps pointing out, yeah, but that's just between PREVA and your client, but not between PREVA and pro-marketing. I mean, how does pro-marketing lose its rights under its security agreement because of some agreement three years later with parties that it's not... I don't think PREVA's lost anything. PREVA still has the rights... Pro-marketing. Oh, I'm sorry. I apologize. Pro-marketing hasn't lost anything. They still have rights to the underlying SCSIC technology. But what the District Court did here was take away what under the design and license agreement Cyber Solutions clearly owns. And I would point you, Your Honor... Isn't there a question whether PMS has this higher level of ownership by virtue of the security agreement and the language that I was reading about what collateral is defined as including copyrights and copyright licenses? No, I don't think so, Your Honor, because I think it's clear that they have some sort of a copyright license continuing interest in the underlying SCSIC technology. But to the extent that Cyber Solutions has improved it and they own that under the design and license agreement... And I'll go... Two things. One, Your Honor, back to the bankruptcy decisions. In the most recent bankruptcy decision, the bankruptcy judge was very clear. He said, I'm not going to get into this. They're trying to bait me into answering who owns TRSS. That's a... I think he either used the word complicated or difficult. He said, that's a question that a court with broader jurisdiction is going to have to answer and it's complicated. I'm not getting into it. So the last bankruptcy judge recognized there is a question, a legitimate question about the ownership of the TRSS. And Judge Moore, back to your point, I think when the confirmation plan, when the bankruptcy judge said, notwithstanding anything in the security agreement, the judge was trying to balance this. I give great credit to the bankruptcy judge. He says, the liens are going to continue, notwithstanding the design and license agreement on the underlying SKZIC. But at the same time, PREVA has to be able to fully execute its duties under the design and license agreement, notwithstanding anything in the security agreement. And the bankruptcy judge clearly understood there was two pieces to this. There's a design piece that is separate from the underlying license, which we paid for, a couple hundred thousand dollars to use the SKZIC, which they have a lien on, ProMarketing has a lien on. But the incentive for CyberSolutions to come in at this bankruptcy and save this company, it just makes sense and I think the bankruptcy judge realized and that's why the design and license agreement was incorporated into the confirmed bankruptcy opinion. The design portion gave them the incentive, not just to pay for the underlying license, but to put money into the technology to develop it and to make it commercially marketable. So I think it makes entire sense that this balance was struck. And what the district court did was say, you didn't have the right to give these ownership interests to PREVA. I mean, that's the holding of the district court's opinion. Why isn't this sort of like an analogy of, say, somebody decides to loan money and get a second mortgage as its security interest, knowing that, hey, if the borrower defaults, the first mortgagee is probably going to win out and wipe out my second mortgage. Isn't that sort of what's happening here? Your Honor, that's exactly what happened with the SKZIC piece. But this is like coming in and saying, I'm going to build a second house on the property and I'm going to own the second house without the mortgage. The first house will be subject to the mortgage, but the second house won't. And that's what happened in this case. I see I'm out of time. I'll reserve my time for rebuttal. May it please the Court, my name is Eric Olson and I represent ProMarketing Sales. Going back to what counsel for CyberSolutions was just saying in response to Judge Gilman's question regarding, isn't this the case of the second mortgage on the house? The answer from CyberSolutions was, no, this is totally different because this is two separate houses. Well, that's not the facts of this case. The Tamper Reactive Secure Storage Technology is solely based on the Secure Key Storage Technology, or what's called the SKSIC technology. So going back to Judge Gilman's question to CyberSolutions, the proper analogy in this case is a house and the rentor to a house builds a bathroom. As an addition. Exactly, Your Honor. That is this case. So what happened, by order of the Bankruptcy Court in the confirmation plan, the Court said, we've gone through this confirmation hearing. We've had two days of testimony on June 11th and June 12th of 2012 in Grand Rapids, Michigan before Judge Jeffrey Hughes, the bankruptcy judge, heard testimony from representatives from CyberSolutions, heard testimony from the officers of Privatek, and what was pitched to the bankruptcy judge was the use of this SKSIC technology. CyberSolutions projected that they were, in words of counsel, were going to save this company. They projected sales in the billions of dollars based on this SKSIC technology, which if that had happened, we would not be here. And that is because pro-marketing would have been paid. The whole deal here is pro-marketing came into this Chapter 11 case as the senior secured creditor owed money, and pro-marketing was subject to a cram down in the Chapter 11 plan of reorganization. They objected to this arrangement with CyberSolutions. Because of those facts, pro-marketing became the beneficiary under 11 U.S.C. 1129B of the absolute priority rule, which states that nobody can gain priority over the property of Privatek Technologies vis-à-vis pro-marketing. So, when the court enters its opinion on plan confirmation, the court states, and I believe Judge Gilman, you referenced this, page 43 of the record. The court would also add that while the technology is being licensed to CSI, that license is subordinate to pro-marketing sales superior lien. And as such, if Priva were to default under the terms of the plan such that pro-marketing could exercise its collateral rights, it would be able to recover that license in whole, notwithstanding, or excuse me, the SKSIC technology in whole, notwithstanding the license that is being granted as part of this plan. What is your answer, though, to opposing counsel's point that, yeah, he agrees with the SKSIC, pro-marketing clearly has the superior lien, but not to the TRSS technology? Your Honor, that is, the plan, that is not what the plan says. The plan is 89 pages, and it's in the record beginning at... The plan doesn't say anything about TRSS, right? Exactly. That's the point I'm trying to make, Your Honor, is the plan does not state anywhere in the 89 pages of the plan that Cyber Solutions acquires improvements to the SKSIC technology. That's nowhere in the plan. What they, what Cyber Solutions points to is this license agreement, and Cyber Solutions says that the district court eviscerated the terms of the license agreement by holding that pro-marketing is allowed to take possession of the technology over Cyber Solutions, that this language in the license agreement, the court completely ignores, as a matter of contract law, is the argument from Cyber Solutions. The problem with that analysis is, once again, it ignores the fact that pro-marketing is the beneficiary under 1129B and the absolute priority rule of this property, and that's exactly how the plan reads, and that's exactly how the license agreement reads. You use the word of this property. Where is there a definition of what this property is? The plan language, Your Honor, if we take a look, section 5.24 of the plan is page 115 First of all, that, just, Your Honor, as a prelude to answering the question, section 5.24 of the plan, page record 115, states that pro-marketing will retain its lien on the SKSICIP in accordance with 1129B2A of the bankruptcy code, notwithstanding that the reorganized debtor's entry into the license agreement. So the question that Your Honor, I believe, is asking is, well, what is the SKSICIP? And that's defined in section 1.185, which is page 98 of the record, Your Honor. SKSICIP means all proprietary rights enforceable by law, including without limitation, patents, copyrights, mask works, and trade secrets incorporated in or specifically relating to the SKSIC. There is absolutely no doubt in this case that the Tampa Reactive Secure Storage Technology incorporates the SKSICIP into that technology. What we're talking about here is an improvement. We have a base set of code that creates the SKSIC technology. You add a little code to improve that technology. And all of a sudden, what Cyber Solutions is doing is rebranding this, the TRSS, and saying that they own it over and above pro-marketing's interest to that underlying IP. And the bankruptcy's plan of reorganization simply does not allow that because it does not preserve pro-marketing's rights as required under section 1129B. Could you make the argument that the TRSS is not incorporated in the SKSIC, but rather the SKSIC is incorporated in the TRSS? Is that significant? The issue is the fact that the SKSICIP, which is what pro-marketing has a right to, is a foundation of the Tampa Reactive Secure Storage Technology, the improvement. So you can't take this improvement, which the record in the bankruptcy court is 90 to 95% of the TRSS is the SKSIC. So the vast majority of TRSS is SKSIC. Are you claiming that's undisputed? Your Honor, I cannot answer that for Cyber Solutions, Your Honor. But I can answer the fact that what we're dealing with is a technology, the Tampa Reactive Secure Storage, that fully incorporates all of the secure key storage technology. And to say that Cyber Solutions owns the Tampa Reactive Secure Storage Technology over and above pro-marketing absolutely defeats their security interest in collateral rights that were preserved by the bankruptcy judge in the plan confirmation, the plan documents themselves, and even the license agreement itself, which in the third, which is also what Cyber Solutions relies upon, if you take a look at the license agreement, which is found at page 71 of the record, the second paragraph under the recital states that the SKSIC is subject to certain liens and security interests, which continue notwithstanding licensor's entry into this license agreement. So just for clarity's sake, because I believe that there's been some confusion regarding these two components of the license agreement, we've heard from Cyber Solutions that there's this licensing component and there's this design services component. And that somehow this design services component is creating a new set of technology. That's simply unthinkable. Untrue. The only technology that's at issue in the design service and intellectual property license agreement is the SKSIC. That's all that they were allowed to do under the license agreement is to continue to design the SKSIC technology. It states in the first line of the recitals, licensor is developing and has developed certain technology related to the security of computers and computer systems known as the secure key storage integrated circuit. So everybody knows that technology, as with any technology, you continue to develop it. And that was the plan here. Nowhere in the 89 pages of the plan of reorganization does it state that Cyber Solutions acquires ownership to improved technology. It's nowhere. And to state that that was a part of this plan is simply erroneous. Now, does the license agreement state that Cyber Solutions would acquire ownership if pro-marketing is paid its security interest? Absolutely. Absolutely. And that's, I think, the big issue in this case is the fact that, unfortunately, as counsel for Cyber Solutions says, we're going to say they were unable to come in into this Chapter 11 reorganization situation and save the company and turn it around. Because if they had, we wouldn't be here. Because we would have been paid. And if that had worked out that way, they would own the technology. But what the court clearly said is, Cyber Solutions, you can't own that technology over this secured creditor. We're not going to allow that. We're preserving them. You're saying they took their chances and lost here. Absolutely, Your Honor. And the fact is that Cyber Solutions knew that they were entering a deal with a company who had been in Chapter 11 bankruptcy for over four months. And they knew that there was a senior secured creditor pro-marketing that they were going to have to answer to. And so if I can point this out, Your Honor, as the last point, in the confirmation hearing, the questioning from that Cyber Solutions was there at participated in. And this is found at Record Entry 30-5. And I can get the page number for you, Your Honor. It's cited in the brief, although. The court says to Mr. Siebert during the confirmation hearing, who's the president of the debtor, Priva Technologies. Okay, Mr. Siebert, I have a few questions for you. Under the terms of the plan, it's anticipated that pro-marketing's lien will continue in the intangibles, including the tech. It's actually, yes, sir. The court. And it's not anticipated that pro-marketing's interest in the tech or pro-marketing's lien in the technology will be subordinated to CSI. Is that correct? The witness. That's correct. The court. So in the event that Priva fails in its plan, it's anticipated and CSI understands that pro-marketing will be able to recover the technology, if it chooses, from CSI. The witness. That's my understanding, yes. Thank you, Your Honors. I think my fellow counsel and I may be talking past each other, so I want to try to make this, put this in a way that will clarify what I think is the key issue in the case. The design and license agreement is a part of the plan. It was incorporated. It was the central feature of the plan. It's the reason there was a bankruptcy reorganization plan. So it's very much, the design and license agreement is very much in the plan. So all this focus in the briefing and a lot of the judges who've dealt with this, they keep focusing on the Skizik IP, the Skizik IP. Well, here's what happened. Of course everyone was focused on the Skizik IP, which everyone agrees, including us, that they have the license to, as it existed on the day that we entered the agreement. The Skizik IP, we thought we were, our client thought they were going to be able to sell and make a lot of money. They couldn't. There were flaws. It wouldn't, it wasn't commercially viable. So what happened? We exercised our rights under the very clear design and license agreement, which is incorporated into the plan to put our own money into making the improvements that created the TRSS. Nobody talks about TRSS, Your Honor, in the bankruptcy plan because it didn't exist. But TRSS is an outgrowth of Skizik, is it not? Absolutely, Your Honor. It absolutely is. But it's very clear. In fact, the design and license agreement even makes this clear, Your Honor. If PRIVA made improvements to Skizik after the design and license agreement that it paid for, they would own it and it would be subject to their lien. That's in our design and license agreement. We understood that. But what we carved out and what the bankruptcy judge allowed was in the situation in the future where we paid our money for improvements to the Skizik, we would own it. And that, Your Honor, is separately ownable intellectual property. Now your client, Cyber Solutions, is taking over all of Skizik for free. You know what, Your Honor? I actually don't think that's true. There's a question out there that is not before this court. What's before this court is the decision by the district judge that we don't even own TRSS, which we clearly do under the documents. The question you ask is a good one. Because Cyber Solutions turned through improvements that technology into something that is going to be commercially viable, that's why we're all here today in Cincinnati, there's a question in the future about what intellectual property rights they may be entitled to as someone who owns a lien on the preexisting work. But Cyber Solutions owns the rights to the improvements. Just like any other derivative intellectual property, there may be a question down the road about if we start to, and I believe we will, this becomes commercially viable, the TRSS, I'm sure there's going to be both business and hopefully not legal, but probably business discussions about who's entitled to what when that technology hits the street. But what the district judge did in this case, Your Honor, it was clearly erroneous to take away the intellectual property which we had a clear contractual right to own. Thank you all very much. I move for your argument. The case will be submitted. Would the clerk call the next?